# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Michael S. Kanne Terence T. Evans Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 50376 | **DATE** | 5/3/2002 |
| **CASE TITLE** | Campuzano, et al. vs. Illinois State Board of Elections, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   For the reasons stated on the attached Memorandum Opinion and Order, the remaining portion of Count I of plaintiffs' amended complaint is dismissed. With the rest of plaintiffs' amended complaint having been dismissed previously, this case is hereby dismissed in its entirety.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | | |
|---|---|---|---|---|---|---|
| | No notices required. | | | number of notices | | |
| X | Notices mailed by judge's staff. (m.o. only) | | | | | |
| | Notified counsel by telephone. | | | date docketed | | |
| | Docketing to mail notices. | | | | | |
| X | Mail AO 450 form. | | | docketing deputy initials | | |
| X | Copy to judge/magistrate judge. ✓ | | | | | 5-3-02 |
| | | | | date mailed notice | | |
| /LC | courtroom deputy's initials | | | | mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | | | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

YOLANDA CAMPUZANO, ARMANDO )
CARDENAS, GUDALUPE GARCIA, )
WILLIE JORDAN, JR., DAVID WINTERS, )
PATRICIA REID LINDNER, J. BRADLEY )
BURZYNSKI, FRANK CANO, JESSE )
JUAREZ, ELIGIO MARIN, LOURDES )
MONTEAGUDO, registered voters and )
Illinois citizens, and the ILLINOIS )
REPUBLICAN PARTY, )
                                  )
         Plaintiffs, )     No. 01 C 50376
                                  )
         v. )
                                  )     Judges Michael S. Kanne,
ILLINOIS STATE BOARD OF )     Terence T. Evans, and
ELECTIONS, RONALD D. MICHAELSON, )     Philip G. Reinhard.
in his official capacity as Executive Director )
of the Illinois State Board of Elections, and )
TOM CROSS, THOMAS MCCRACKEN, )
WALTER DUDYCZ, THOMAS MARCUCCI, )
BARBARA FLYNN CURRIE, VINCE )
DEMUZIO, RAYMOND EWELL, JORGE )
RAMIREZ, and MICHAEL BILANDIC, all )
in their official capacities as members of the )
Illinois Redistricting Commission, )
                                  )
         Defendants. )
                                  )

## ORDER

Section 2 of the Voting Rights Act of 1965 guarantees that State legislative

districts are drawn to afford all members of the electorate, including racial

minorities, equal opportunities to participate in the political process and elect

candidates of their choice. 42 U.S.C. § 1973. The Illinois Republican Party and

individual Illinois voters bring this action under § 2 to challenge the validity of the

Illinois 2001 state legislative redistricting plan, alleging that the plan fails to

provide African-American voters sufficient opportunity to elect African-American

candidates.  Plaintiffs seek a permanent injunction to prevent elections under this

plan, and request that the court draw and establish a new redistricting map to

replace it.  The Chief Judge of the United States Circuit Court of Appeals for the

Seventh Circuit convened this three-judge district court panel pursuant to 28 U.S.C.

§ 2284, and in January 2002 this panel presided over a trial on the merits.  After

reviewing all the evidence presented, we reject plaintiffs' arguments and conclude

that plaintiffs have failed to prove a § 2 violation.

## BACKGROUND

This action arises from the Illinois state legislature's efforts to redistrict the

seats of the Illinois General Assembly following the 2000 Federal Decennial Census.

The 2000 Census revealed that the State's total population had increased by almost

one million persons over the past decade, but that the population growth was not

evenly distributed throughout the State's legislative districts.  Because some

districts experienced population growth disproportionate to others, the state

legislature was required to fundamentally alter the boundary lines of the General

Assembly House and Senate districts.  Upon the General Assembly's failure to enact

a redistricting plan, the task of redrawing the district lines ultimately fell to the

Legislative Redistricting Commission, which on September 25, 2001 approved a

plan (the "Commission Plan").  Plaintiffs brought this action alleging that the

Commission Plan violates § 2 of the Voting Rights Act because it fails to create a

sufficient number of districts in which the candidate elected will be the choice of either African-American or Latino voters. Furthermore, plaintiffs argued the Commission Plan was drafted in violation of the Fourteenth Amendment's guarantees of procedural due process and equal protection.

Plaintiffs named as defendants the Illinois State Board of Elections, the Board's Executive Director, and the nine members of the Legislative Redistricting Commission who participated in the adoption of the redistricting plan. All of the state defendants were represented in their official capacities by the Illinois Attorney General, who on the first day of trial adopted the plaintiffs' position that the Commission Plan violated the Voting Rights Act. The case did not become moot, however, because several additional parties had been permitted to intervene as defendants, including the five Democratic members of the Redistricting Commission, the League of United Latin American Citizens (LULAC), and the African American Working Group (AAWG), a non-partisan coalition of civil rights organizations representing the interests of the region's African-American community. At trial the intervenors were the sole defenders of the Commission Plan.

At the outset of the trial, several motions of defendant-intervenors were pending, including motions to dismiss plaintiffs' constitutional claims (Counts II and III of plaintiffs' amended complaint). Before the presentation of opening statements, this panel announced from the bench that it would dismiss plaintiffs' procedural due process claim (Count II) and that a written order would follow. Also

before opening statements plaintiffs voluntarily dismissed their equal protection

claim (Count III). Later, on the last day of trial, plaintiffs stated in open court that

they formally abandoned their procedural due process claim. Therefore both of

plaintiffs' constitutional claims have been voluntarily dismissed with prejudice.

At the close of plaintiffs' case, defendant-intervenor LULAC moved for a

partial directed verdict on Count I of plaintiffs' amended complaint, alleging that

plaintiffs had failed to present sufficient evidence to support a § 2 Voting Rights Act

claim of Latino vote dilution. We granted LULAC's motion, finding that as a

matter of law the Commission Plan does not violate the voting rights of Latinos in

Illinois. Accordingly, this opinion addresses only the remaining portion of Count I –

whether the Commission Plan discriminates against African-American voters by

failing to provide a sufficient number of districts in which African-Americans have

the opportunity to decide General Assembly races.

## DISCUSSION

Voting Rights Act § 2 prohibits, in pertinent part, the implementation of a

redistricting plan that denies or abridges African-American voters' equal

participation in the political process. *See* 42 U.S.C. § 1973. To determine whether a

challenged redistricting plan impermissibly thwarts African-Americans' ability to

elect candidates of their choice, courts consider the "totality of the circumstances"

and examine a variety of objective factors concerning the impact of the challenged

plan, and the social and political context in which the plan exists. *See Ketchum v.*

*Byrne,* 740 F.2d 1398, 1403-04 & n.5 (7th Cir. 1984) (identifying numerous factors

that should be considered for an assessment of a redistricting plan's effect on

minority-voter opportunities to participate in the electoral process).

In establishing a § 2 Voting Rights Act violation, however, plaintiffs must

first demonstrate, as a threshold matter, the existence of three factors first set out

in *Thornburg v. Gingles,* 478 U.S. 30, 50-51 (1986): (1) the African-American

community is sufficiently large and geographically compact to constitute a majority

in at least one district; (2) African-Americans are a politically cohesive group; and

(3) the white majority votes sufficiently as a bloc to typically prevent African-

Americans from electing candidates of their choice. The parties here stipulate that

all three conditions exist in Illinois. Accepting the parties' stipulations, we will

proceed to inquire whether plaintiffs have shown under the totality of the

circumstances that the Commission Plan diminishes or abridges the voting strength

of African-Americans in Illinois. *See Voinovich v. Quilter,* 507 U.S. 146, 155-57

(1993) (plaintiffs have burden of proving an apportionment plan's invalidity).

For a plan to provide minority voters equal participation in the political

process, it must generally provide a number of "effective" majority-minority districts

that are substantially proportionate to the minority's share of the state's

population. *See Johnson v. De Grandy*, 512 U.S. 997, 1013-14 & n.11 (1994). The

parties use the term "majority-minority" districts to refer to districts in which non-

whites comprise more than 50% of the population. In "effective" districts African-

American voters are not guaranteed success at the polls, but such districts do

contain sufficient African-American voters so that, more likely than not, African-

American preferences will determine the outcome of district elections. Since the African-American population in Illinois comprises almost 15% of the state's total population, and Illinois has a total of 118 State House districts and 59 State Senate districts, proportionality requires that a plan redistricting Illinois voters create between 17 and 18 House districts, as well as 8 to 9 Senate districts, in which African-Americans enjoy "effective" political opportunities.

Plaintiffs argue that the Commission Plan fails to create 17 such House districts, and raise two related Voting Rights Act challenges: first, that the Commission Plan's "majority-minority" districts lack sufficient numbers of African-American voters to ensure that African-Americans will have effective opportunities to elect the candidates of their choice; and second, that the plan "fractures" a number of African-American communities, thereby unnecessarily diluting their voting strength in neighboring districts.[1]

---

[1] Plaintiffs also challenge the effectiveness of the Commission Plan's Senate districts. Every Senate district in Illinois is comprised of two neighboring House districts. The Commission Plan at issue creates eight majority-African-American Senate districts, each of which combines two neighboring majority-African-American House districts. Plaintiffs argue that only four of these eight Senate districts provide African-Americans with "effective" electoral opportunities. Although the parties presented some analysis regarding the effectiveness of the Senate districts, trial testimony and briefs focused primarily on the House districts. We too focus primarily on the House districts. Since the Senate districts at issue are each comprised of two majority-minority House districts, if the House districts satisfy the requirements of § 2, the Senate districts will also comply with the Voting Rights Act.

I.    The Majority-Minority Districts

Plaintiffs primarily contend that the Commission Plan's "majority-minority" districts require greater numbers of African-American voters to provide African-Americans with effective opportunities to elect their candidates of choice. The parties agree that the Commission Plan creates 18 majority-African-American districts[2] and one additional majority-minority district in which African-Americans are a plurality.[3] In total, defendant-intervenors claim that the Commission Plan thus creates 19 effective districts for African-American voters. Plaintiffs disagree, and contend that although African-Americans outnumber other populations in all 19 districts, the African-American constituents nevertheless lack sufficient voting strength in most of these districts to have an effective chance of determining the winner of their district's General Assembly races.

Plaintiffs claim that as many as 11 of the Commission Plan's 18 African-American majority districts (as well as House District 78 – the remaining majority-minority district) fail to qualify as effective districts. In support, plaintiffs rely primarily on the so-called "rule of thumb" that African-Americans must represent

---

[2] These 18 districts include House Districts 5, 6, 7, 8, 9, 10, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 38, and 114. In these districts African-Americans comprise over 50% of the district's total population and voting-age population.

[3] In House District 78, neither African-Americans nor Latinos form a majority, but together they comprise a plurality. The combined population of African-Americans and Latinos in that district is 57.9% (41.3% and 16.6%, respectively). Together these groups also comprise 53.7% of the district's voting-age population (38.9% and 14.8%, respectively).

65% of the total population or 60% of the voting-age population ("VAP") of a district

in order to have an effective opportunity to elect a candidate of their choice. *See*

*Barnett v. City of Chicago,* 141 F.3d 699, 702 (7th Cir. 1998); *Ketchum,* 740 F.2d at

1415-16. Plaintiffs note that in the Commission Plan's 19 majority-minority

districts, African-Americans constitute less than 60% VAP in nine districts, and less

than 65% of the total population in three additional districts.[4] Accordingly,

---

[4] The population statistics for the 18 majority-African-American districts provided in the Commission Plan are as follows:

| House District # | % African-American Total Population | % African-American Voting-Age Population |
|---|---|---|
| 5 | 61.8 | 52.5 |
| 6 | 65.2 | 63.1 |
| 7 | 60.2 | 57.7 |
| 8 | 62.2 | 59.6 |
| 9 | 67.5 | 60.9 |
| 10 | 62.8 | 56.3 |
| 25 | 65.6 | 63.3 |
| 26 | 67.1 | 60.7 |
| 27 | 62.8 | 62.1 |
| 28 | 63.0 | 61.1 |
| 29 | 60.5 | 55.2 |
| 30 | 60.0 | 57.0 |
| 31 | 63.2 | 60.9 |
| 32 | 69.9 | 68.9 |
| 33 | 65.8 | 66.6 |
| 34 | 69.1 | 68.1 |
| 38 | 60.4 | 56.8 |
| 114 | 56.0 | 53.3 |

In the Commission Plan's majority-minority district (House District 78), African-Americans comprise 41.3% of the total population and 38.9% of the voting-age population.

plaintiffs argue that the Commission Plan violates § 2 by providing African-Americans at most 10 districts (under the 60% VAP rule), and possibly as few as seven (under the 65% total population rule), in which they will have an effective opportunity to elect the candidates of their choice – numbers far less than the 17 to 18 required under the proportionality doctrine.

A.    The Rule of Thumb

In the absence of more reliable data regarding African-American voting strength, courts employ the general guideline that African-Americans must comprise 65% of a district's total population to control the electoral outcome in that district. *See Ketchum*, 740 F.2d at 1415 (guideline used where empirical data ambiguous or indeterminate). This "rule of thumb" implicitly acknowledges that certain factors impact African-American voting strength disproportionately to white voting strength. *See Barnett*, 141 F.3d at 702. For example, African-Americans tend to have higher non-voting age population percentages, lower voter registration, and lower turnout rates than whites. *Id.* Accordingly, African-Americans "must have something more than a mere majority even of voting age population in order to have a reasonable opportunity to elect a representative of their choice." *Ketchum*, 740 F.2d at 1413. Courts have arrived at a 65% figure by beginning with a simple majority (50% plus one voter) and adjusting that figure upward by 5% to account for a younger population, 5% for low voter registration, and 5% for low voter turnout. *See id.* at 1415. This incremental 15% adjustment is merely an approximate

corrective, used to evaluate minority voting strength when more specific voting data (e.g., VAP, registration, and turnout) is unavailable. *See id.* at 1413.

When reliable VAP statistics are available, we may instead evaluate minority voting strength by using a 60% VAP rule of thumb. *See id.* (recognizing that courts commonly use 60% VAP corrective); *Prosser v. Elections Bd.,* 793 F. Supp. 859, 869 (W.D. Wis. 1992) (three-judge panel) (VAP data more relevant than total population figures). This 60% corrective has a similar derivation to the 65% rule of thumb, but omits the five percent upward adjustment for African-Americans' younger population. *See Ketchum,* 740 F.2d at 1415 (because VAP statistics measure African-Americans' age relative to other groups, "[o]bviously if voting age population statistics are used, 5% would drop out of the formula"). In this case the parties have stipulated to the accuracy of the census data, including total population and VAP statistics. Furthermore, a district-by-district examination of this data reveals that the difference between African-Americans' total population and their voting-age population often proves to be significantly less than the 5% representing African-Americans' generally younger population found in the uniform corrective applied by the 65% rule of thumb.[5] Since the voting-age statistics more accurately measure African-American voting strength in the challenged districts,

---

[5] In 15 of the 19 districts, the difference between African-American total population and voting-age population was less than 5%, ranging from -0.8% in District 33 to 4.3% in District 29. The negative figure means that in District 33, African-Americans actually had a *higher* proportion of voting-age population compared to other groups.

we would use the 60% VAP rule of thumb in the absence of more meaningful and

persuasive statistical evidence. *See id.*

      Examining the voting-age population statistics for the Commission Plan's

challenged districts, we note that only 10 of 18 African-American majority districts

have an African-American voting-age population above 60%.[6] But this statistical

shortfall does not necessarily mean that the Commission Plan violates § 2. *Cf.*

*Johnson v. De Grandy*, 512 U.S. at 1018 (stating that "[a]n inflexible rule would run

counter to the textual command of § 2, that the presence or absence of a violation be

assessed 'based on the totality of circumstances'"). The actual minimum population

of African-Americans needed to constitute an effective district varies depending on

the totality of the circumstances. *See Ketchum,* 740 F.2d at 1418 (inviting use of

"statistically supportable alternative corrective"). Indeed, courts have found that

districts with populations approximating 60% VAP may nevertheless prove

effective. *See Ketchum v. City Council of Chicago,* 630 F. Supp. 551, 561 (N.D. Ill.

1985) (three-judge panel) (finding 58% VAP an effective African-American majority

under totality of the circumstances); *Illinois Legislative Redistricting Comm'n v.*

*LaPaille,* 786 F. Supp. 704, 712 (N.D. Ill. 1992) (three-judge panel) (finding a 57.2%

VAP district effective); *Jeffers v. Clinton,* 756 F. Supp. 1195, 1200 (E.D. Ark. 1990)

(three-judge panel) (finding effectiveness of 58% VAP district depends on race of

---

[6] It should be noted that four districts only narrowly miss the 60% VAP mark, including District 8 (59.6%), District 7 (57.7%), District 30 (57.0%), and District 38 (56.8%).

incumbent).  We are mindful that the 60% VAP guideline represents only a general

target to be used in the absence of more reliable data and "should be reconsidered

regularly to reflect new information and new statistical data." *Ketchum,* 740 F.2d at

1416.

B.      Other Statistical Evidence of Effectiveness

The rule of thumb's continuing significance and utility has been called into

question in this case by the parties' redistricting experts, Dr. Theodore Arrington

(for the plaintiffs) and Dr. Allan Lichtman (for the intervenor-defendants).  Dr.

Lichtman testified at trial that current voting rights scholarship generally opposes

uniform application of the rule of thumb to majority-minority districts because

factors such as age, registration rates, and turnout behavior of voters can vary

significantly from district to district.  Dr. Arrington did not dispute this testimony,

and also expressly disavowed the use of the rule of thumb.  *Cf. Johnson,* 512 U.S. at

1020-21 (stating that "[n]o single statistic provides courts with a shortcut to

determine whether a set of single-member districts unlawfully dilutes minority

voting strength").  To avoid reliance on any rule of thumb, both experts evaluated

the effectiveness of the Commission Plan's majority-minority districts by producing

complex district-by-district statistical analysis of past African-American voting

patterns in Illinois.

Since both experts disfavor use of the rule of thumb, we must determine

whether the statistics they have presented are reliable and determinative of

whether or not the Commission Plan provides sufficient districts with effective

electoral opportunities for African-Americans. *See Ketchum,* 740 F.2d at 1414-15

(stating that district courts have discretion "to determine what an appropriate

corrective should be based upon analysis of election data, if such data can yield a

meaningful and persuasive result"); *see also Gingles,* 478 U.S. at 45-46 (applying

"flexible, fact-intensive test," including a "practical evaluation of the past and

present reality" and a "functional view of the political process"). The parties have

stipulated to the accuracy of the census data, and do not challenge the accuracy of

the election results upon which the two experts based their analyses; accordingly,

we find this underlying data reliable. Although plaintiffs retain the primary

burden of proving the Commission Plan's invalidity, we next consider, however,

whether, through analysis of this data, defendant-intervenors have persuasively

demonstrated that the Commission Plan provides African-Americans effective

electoral opportunities in at least 17 districts.

To demonstrate that the Commission Plan's 19 majority-minority districts

will provide African-Americans effective opportunities to elect candidates of their

choice, Dr. Lichtman presented statistical evidence of African-American voting

strength derived from two independent methods, each utilizing different sets of

underlying data. In both methods Dr. Lichtman used past voting patterns of those

individuals living within the majority-minority district boundaries to estimate their

voting and turnout behavior in future elections.[7]

---

[7] This type of statistical analysis, termed an "ecological regression," is a
standard method for inferring future voting behavior of population groups, and is

First, Dr. Lichtman presented evidence that the Commission Plan would allow African-Americans to overwhelmingly control the Democratic party's nomination process in the majority-minority district primaries,[8] and that the candidate nominated (the African-Americans' candidate of choice) would most likely be the candidate elected, because African-Americans also constitute a majority of those voting in their districts' general elections. To show this, Dr. Lichtman examined the precinct-by-precinct election results from all Democratic primaries and general elections between 1992 through 2000, and then calculated district-by-district the percentage of actual voters in each of these elections who were African-American.

Applying this methodology, Dr. Lichtman presented persuasive evidence that the Commission Plan's majority-minority districts provide African-Americans with effective opportunities to elect their preferred candidates. In each of the Commission Plan's 18 African-American-majority districts, Dr. Lichtman demonstrated that African-Americans represented a strong majority of the voters who cast ballots in every Democratic primary election between 1992 and 2000.[9]

accepted and utilized by both redistricting experts in this case.

[8] The parties agree that focusing on the Democratic primary election is most appropriate in this case. African-Americans vote overwhelmingly Democratic and African-Americans' ability to elect the candidate of their choice depends critically on their ability to determine the victor in the Democratic primary. For this reason, both redistricting experts focus their analysis on African-American voting strength not only on the general election, but also on the Democratic primary.

[9] Although on average African-Americans also represented a majority of those voting in the Commission Plan's majority-minority district (District 78),

According to Dr. Lichtman, examination of the mean percentages of African-Americans voting in the five Democratic primary elections during this period reveals that African-Americans comprised at least 67% of the citizens who voted in each of the districts.[10] Examining statistics from each of the African-American majority districts in the five general elections held between 1992 and 2000, Dr. Lichtman found that African-Americans also comprised a majority of those who voted in 88 of 90 elections.[11] Assuming that past voting patterns will repeat themselves in future elections, these results demonstrate that in each of the 18 African-American-majority districts African-Americans will almost always constitute a majority of actual voters both in Democratic primaries and in general elections. In other words, these results strongly suggest that, regardless of any rule

---

African-American voting strength in this district appears significantly weaker compared to the 18 African-American majority districts. In that district African-Americans represented a majority of those voting in only three out of five Democratic primaries, and on average constituted only 54% of those voting in the district primary.

[10] These results also demonstrate that African-American voting strength does not always correlate to high VAP percentages. Of all the challenged African-American-majority districts, District 6, which has an African-American VAP that exceeds the 60% rule of thumb, produced the weakest voter-turnout result – on average only 67% of those who voted were African-American. In contrast, the district with the lowest African-American VAP among these districts, District 114 (53% VAP), nevertheless enjoyed the highest percentage of voter turnout, for a mean of 89% African-American among voters. The lack of correlation between VAP percentages and actual voter turnout in elections further demonstrate that VAP figures do not accurately evaluate the electoral strength of a district.

[11] In the majority-minority district (District 78), African-Americans on average constituted only 41% of those voting in the general election.

of thumb, the Commission Plan provides African-American residents of these districts an effective opportunity to elect candidates of their choice.

Dr. Lichtman also presented a second method of demonstrating the effectiveness of the Commission Plan's majority-minority districts. Under this methodology Dr. Lichtman evaluated the extent to which Democratic primary and general election voters in these districts supported African-American candidates facing white opponents in statewide and countywide races from 1992 through 2000. Among these statewide and countywide races, Dr. Lichtman examined contests having similar voter participation rates to General Assembly races, such as contests for Recorder of Deeds, Cook County Circuit Court Clerk, and Cook County Board President. Dr. Lichtman suggested that if the African-American candidates in these select contests enjoyed greater support than white candidates within the challenged districts, then those districts were also likely to elect an African-American candidate opposing a white candidate for a General Assembly seat. The parties agree that, with few exceptions, African-Americans overwhelmingly prefer representation by African-American candidates. *See also Barnett*, 141 F.3d at 702. Therefore, evidence that African-American candidates enjoy greater support than white candidates within a district would suggest that the district provides African-Americans with effective opportunities to elect the candidate of their choice.

This second methodology also yielded persuasive evidence that the Commission Plan provides African-Americans with effective electoral opportunities. In the Democratic primaries, the African-American candidates in these select races

received at least 58% of the vote in every Commission Plan district, often with vote totals that exceeded 80%. In general elections, African-American Democratic candidates also enjoyed overwhelming support in the majority of the challenged districts, and no candidate received less than 50% of the vote in any of the districts. The overwhelming success of the African-American candidates in these comparable statewide and countywide races suggests that an African-American Democratic candidate for General Assembly would have a reasonable opportunity in each of the Commission Plan's 19 majority-minority districts to defeat a white opponent in both the Democratic primary and subsequent general election.

C.     Challenges to Defendant-Intervenors' Statistics

To meet their burden of proving the Commission Plan's invalidity, plaintiffs must not only discredit Dr. Lichtman's analysis, but must also prove that the Commission Plan fails to provide African-Americans with sufficient electoral opportunities. Plaintiffs attack the reliability of Dr. Lictman's analysis by focusing on his use of election data that is "exogenous" – or derived from elections other than General Assembly races. They contend that Dr. Lichtman's results are unreliable because some courts have held exogenous results to be less probative than data that is "endogenous," or in this case, based on General Assembly races. *See NAACP v. Fordice,* 252 F.3d 361, 370 (5th Cir. 2001); *Johnson v. Hamrick,* 196 F.3d 1216, 1222 (11th Cir. 1999); *Goosby v. Town Bd. of Hempstead,* 180 F.3d 476, 497 (2nd Cir. 1999); *Sanchez v. Colorado,* 97 F.3d 1303, 1324-25 (10th Cir. 1996).

We cannot agree, however, that Dr. Lichtman's omission of General Assembly election data from his analysis undermines the validity of this methodology or the probativeness of his results. *See NAACP,* 252 F.3d at 370 ("the exogenous character of elections does not render them nonprobative"); *Solomon v. Liberty County Comm'rs,* 221 F.3d 1218, 1227 (11th Cir. 2000) (district court not required to consider endogenous elections more probative); *Monroe v. Woodville,* 881 F.2d 1327, 1330 (5th Cir. 1989) (exogenous election data not per se irrelevant); *see also Clark v. Calhoun County,* 88 F.3d 1393, 1397 (5th Cir. 1996) (based on statistical evidence from exogenous elections, court concludes that racially polarized voting exists). Dr. Lichtman's analysis relies on historical exogenous election results from all the precincts contained within the Commission Plan's majority-minority district boundaries. This analysis is therefore based on the voting patterns of voting-aged citizens residing within the boundaries of a Commission Plan majority-minority district who actually voted in a statewide or countywide election contest similar to a General Assembly race. Although based on exogenous elections, these results nevertheless provide useful information about African-American voter turnout and voting strength, specific to each individual district within the Commission Plan, and are probative in answering the question whether the Commission Plan provides African-Americans with effective electoral opportunities.

Furthermore, two factors lead us to question whether the results of endogenous races yield voting patterns that truly represent the newly-drawn districts. First, because no General Assembly races have been held under the Commission Plan, endogenous election results must be drawn from districts that existed only prior to the legislative reapportionment. Reliance on these election results proves problematic because the territory encompassed by these prior majority-African-American districts does not substantially overlap the Commission Plan's newly-drawn majority-minority districts. Therefore this endogenous data represents the voting patterns of some individuals who have not been redrawn into the new majority-minority districts, and any conclusions about African-American voting strength based upon this data would not represent the actual effectiveness of the Commission Plan's districts.

Second, the sample of elections from which endogenous analysis can be drawn is statistically small. Dr. Arrington could identify only 10 elections from seven districts in which an African-American ran against a white opponent for a General Assembly seat in both the Democratic primary and the general election.[12] Moreover, a predominant number of these contested races involved a white incumbent, even though a white incumbent is expected to run for a General Assembly seat in only two or three of the Commission Plan's majority-minority

---

[12] Dr. Arrington bases his statistical analysis on endogenous election results, and plaintiffs rely on his "effectiveness index" to show that the Commission Plan denies African-Americans sufficient electoral opportunities.

districts. These limitations of the General Assembly election results further suggest that "endogenous" results may be no more probative than the data presented by Dr. Lichtman.

Thus the court has before it the opinions of two experts, who reach opposite conclusions regarding the effectiveness of the Commission Plan's majority-minority districts, and neither expert's method seems more probative than the other's. We find Dr. Arrington's and Dr. Lichtman's methods of evaluating the Commission Plan's effectiveness equally plausible, but because plaintiffs bear the burden of showing the Commission Plan's invalidity, we conclude that they have failed to meet that burden. Accordingly, we find that the Commission Plan provides African-Americans effective opportunities to elect candidates of their choice and that plaintiffs have failed to establish a § 2 violation.

II.    Fracture

Finally, plaintiffs argue that the Commission map violates § 2 because it "fractures" 69,000 African-Americans populating three areas adjoining the Commission Plan's allegedly ineffective majority-minority districts. Accepting for argument's sake that the Commission Plan indeed fractures a cohesive community of African-Americans, plaintiffs' claim cannot prevail. Unless the reasonable opportunity of African-Americans to elect candidates of choice is directly at stake, we are not authorized to correct fracturing of a cohesive community, no matter how undesirable the effect. *See Ketchum*, 740 F.2d at 1419. Since plaintiffs cannot show that the Commission Plan fails to provide effective districts, the Commission Plan

satisfies § 2 of the Voting Rights Act, and we need not to consider whether a more effective map could be drawn.

## CONCLUSION

This court finds, based on the record as a whole, that the redistricting plan for the Illinois General Assembly, approved by the Illinois Legislative Redistricting Commission, provides African-Americans an effective opportunity to elect candidates of their choice in a number of districts that is proportionate to their population and therefore complies with the Voting Rights Act. For the foregoing reasons, we dismiss the remaining portion of Count I of plaintiffs' amended complaint. With the rest of plaintiffs' amended complaint having already been dismissed, this case is hereby dismissed in its entirety.

SO ORDERED

MICHAEL S. KANNE, CIRCUIT JUDGE

TERENCE T. EVANS, CIRCUIT JUDGE

PHILIP G. REINHARD, DISTRICT JUDGE

DATED:     NOV 0 3 2002

# United States District Court
## Northern District of Illinois
### Western Division

Yolanda Campuzano, et al.

v.

Illinois State Board of Elections, et al.

**JUDGMENT IN A CIVIL CASE**

Case Number: 01 C 50376

☐ Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

☑ Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that the remaining portion of Count I of plaintiffs' amended complaint is dismissed. Withe the rest of plaintiffs' amended complaint having been dismissed previously, this case is hereby dismissed in its entirety.

All orders in this case are now final and appealable.

FILED-WD
02 MAY -3 AM 10: 29
CLERK
U.S. DISTRICT COURT

Michael W. Dobbins, Clerk of Court

_Susan Wessman_

Susan M. Wessman, Deputy Clerk

Date: 5/3/2002